# EXHIBIT 1

John E. Flaherty
Ravin R. Patel
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

*Attorneys for Plaintiffs,*
*Merck & Co., Inc., and*
*Merck Sharp & Dohme Corp.*

*Of Counsel:*

Raymond A. Kurz
Anna Kurian Shaw
Hogan Lovells US LLP
555 Thirteenth St. NW
Washington, D.C. 20003
(202) 637-5600

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MERCK & CO., INC., and<br>MERCK SHARP & DOHME CORP.,<br><br>        Plaintiffs,<br><br>v.<br><br>MERCK KGAA<br><br>        Defendant. | CIVIL ACTION NO.:<br><br>**COMPLAINT FOR TRADEMARK INFRINGEMENT, TRADEMARK DILUTION, UNFAIR COMPETITION, FALSE ADVERTISING, DECEPTIVE TRADE PRACTICES, CYBERSQUATTING AND BREACH OF CONTRACT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively, referred to as "**Plaintiffs**" or "**Merck**"), by its attorneys, allege for their Complaint against Defendant Merck KGaA (referred to as "**Defendant**" or "**KGaA**") the following:

### Nature of Action

1.  In this action, Plaintiffs assert both federal and state causes of action based on Defendant's deliberate and unauthorized use of MERCK as follows: (a) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (b) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); (c) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (d) trademark infringement under N.J. Stat. § 56.3-13.16; (e) trademark

dilution under N.J. Stat § 56:3-13.20; (f) unfair competition under N.J. Stat. § 56.4-1; (g) unfair competition under New Jersey common law; (h) false advertising in violation of the Lanham Act 15 U.S.C. § 1125(a)(1)(B); (i) deceptive trade practice under N.J. Stat. § 56.8-2; (j) cybersquatting in violation of the Anticybersquatting Consumer Protection Act 15 U.S.C. §1125(d); and (k) breach of contract. Plaintiffs seek damages and injunctive and other relief against Defendant for its willful and unlawful activities as alleged in greater detail below.

## Parties

2.      Merck Sharp & Dohme Corp., a U.S. corporation organized under the laws of New Jersey having its place of business at One Merck Drive, Whitehouse Station, NJ, 08889-0100, manufactures and sells pharmaceutical products (referred to hereafter as "**Merck Sharp & Dohme**").

3.      Merck & Co., Inc. is a U.S. corporation organized under the laws of New Jersey having its place of business at 2000 Galloping Hill Road, Kenilworth, NJ 07033 (referred to hereafter as "**Merck & Co., Inc.**"). Merck Sharp & Dohme is a wholly-owned subsidiary of Merck & Co., Inc.

4.      Upon information and belief, Defendant Merck KGaA, a German corporation, having a place of business at Frankfurter Str. 250, 64293, Darmstadt, Germany, manufactures and sells chemical and pharmaceutical products.

## Venue and Jurisdiction

5.      This is an action for federal and state trademark infringement, trademark dilution, unfair competition, false advertising and deceptive trade practices under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051 *et seq.* ("**Lanham Act**") and/or the laws of the State of New Jersey;

cybersquatting under the Anticybersquatting Consumer Protection Act 15 U.S.C. §1125(d); and breach of contract.

6.     This Court has subject matter jurisdiction of this action under the trademark laws of the United States, 15 U.S.C. § 1121 and under 28 U.S.C. §§ 1332(a) and 1338(a).

7.     This Court also has jurisdiction over the state law claims under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, because the federal and state claims are based on the same operative facts, and judicial economy, convenience, and fairness to the parties will result if this Court assumes and exercises jurisdiction over the state law claims.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events giving rise to the claim occurred in this District and § 1391 (c) because, upon information and belief, Defendant is not a resident of the United States.

9.     Upon information and belief, Defendant has advertised, promoted, distributed, offered to sell and/or sold its products in this District and has made unauthorized use of MERCK as set forth below in this District.  Additionally, Defendant's predecessor entered into a contract with Merck Sharp & Dohme's predecessor, as described in more detail below.

## History & Background

10.     Although Plaintiffs and KGaA share a common heritage, they are and have been unrelated entities for nearly a century. In 1668, their common predecessors, members of the Merck family, founded a business that would later expand into the United States. The U.S. business was organized as Merck & Co. in 1891 ("**Merck & Co.**"), subsequently incorporated as Merck & Co. in 1908 and reorganized as Merck & Co., Inc. in 1927. 1/ Merck Sharp & Dohme is a successor in interest to Merck & Co. which was initially organized in 1891.

---

1/     This entity is a different entity than Plaintiff Merck & Co., Inc. and no longer exists today.

11.     In 1917, during World War I, the U.S. government seized Merck & Co. stock owned by German interests. This stock was later purchased by George Merck, a U.S. citizen, in 1919. Thus, since at least World War I, Merck Sharp & Dohme (and its predecessor entities) and KGaA (and KGaA's predecessor entities) have been separate and independent companies. Through the years, the parties have entered into coexistence agreements (collectively referred to herein as the "**Coexistence Agreements**" and each a "**Coexistence Agreement**") which, among other things, set forth what each company can and cannot do in various jurisdictions around the world regarding use of MERCK.

12.     A Coexistence Agreement was entered into in 1955 between Merck & Co., Inc. of Rahway, New Jersey, 2/ and Emanuel Merck offene Handelsgesellschaft of Darmstadt, Germany, and such was later replaced by a 1970 Coexistence Agreement between Merck & Co., Inc. of Rahway, New Jersey, 3/ and E. Merck of Darmstadt, Germany, which contained many of the provisions in the 1955 Coexistence Agreement. KGaA is a successor of E. Merck and bound by the Coexistence Agreements. Merck Sharp & Dohme is also bound by and entitled to the rights under the Coexistence Agreements. As the parent company, Merck & Co., Inc. is an affiliate of Merck Sharp and Dohme and is also bound by and entitled to the rights under the Coexistence Agreements.

13.     The 1970 Coexistence Agreement allowed for E. Merck's use of "E. Merck" as all or part of a "firm-name or corporate name" in the United States, provided such names are geographically identified with Germany as follows: "E. Merck, Darmstadt, Germany" all words being given equal prominence. The 1970 Coexistence Agreement also provided that E. Merck would not use the trademark MERCK in the United States and Canada or attempt to acquire

---

2/      *See supra* note 1.
3/      *See supra* note 1.

4

rights in any trademark containing MERCK in the United States and Canada and acknowledged Merck & Co., Inc.'s 4/ exclusive rights to use the MERCK trademark in the United States and Canada. Attached as **Exhibit A** is the 1970 Coexistence Agreement.

14.     Over the years, disagreements have arisen between the parties relating to their respective uses of MERCK on the internet and otherwise in different jurisdictions and the parties have had a continuing dialogue which raised and, in certain instances, addressed such issues. Certain matters were not resolved between the parties and KGaA initiated litigation against Merck and related entities in 2013 in the United Kingdom, Germany and France.

15.     On December 17, 2015 the Paris Court of First Instance issued a judgment finding that certain of the accused activities by companies related to Merck did not constitute infringement and unfair competition while other accused activities were found to infringe ("**French Decision**").  On January 15, 2016, the English High Court issued a judgment finding that Merck had breached the 1970 Coexistence Agreement and infringed KGaA's trademark rights as a result of certain activities directed towards the United Kingdom ("**UK Decision**") based on use of the word MERCK on promotional and information activity (such as offering jobs, attracting innovators or suppliers).  As noted in the UK Decision, such finding was not based on Merck's use of the sign MERCK in connection with the sale of products or any material pharmaceutical business transacted in the United Kingdom, as Merck has not engaged in such uses in the United Kingdom. Merck now brings this action based on KGaA's activities in the U.S. as set forth herein.

16.     One of the issues that has not been resolved between the parties is the extent to which use of "Merck KGaA" would be made in the United States. Until recently, use of the Merck KGaA

---

4/      *See supra* note 1.

name has not been specifically directed to the United States and/or has not been used in connection with business activities that are in direct competition with Merck in the United States.

17.     Recently, KGaA has been making ubiquitous use of "Merck KGaA, Darmstadt, Germany," "Merck KGaA" and "MERCK" as a prominent feature of its branding in the United States, including use on websites which are specifically targeted to users in the United States (despite KGaA claiming that its operating companies in the United States today purportedly operate under the trade name "EMD") as well as on social media sites that are more broadly accessible, including in the United States.

18.     KGaA has also recently engaged in other acts as part of a systematic pattern of behavior which is increasingly disruptive and damaging to Merck's exclusive rights in the MERCK trademarks and trade name in the United States.  KGaA has taken a new direction and refocused its efforts on becoming a major player in the U.S. market, including specifically in the immuno-oncology field where it directly competes with Merck, a well-recognized leader in that field.

19.     In 2013, Stefan Oschmann, then head of pharmaceuticals for KGaA (and a former long-term employee and executive of Merck Sharp & Dohme, its predecessors and/or affiliate(s)), stated that the U.S. was viewed as an emerging pharmaceutical market for KGaA and that the company was focusing on investing in its U.S. pharmaceutical business and developing new products to be offered directly by KGaA in the U.S.  This was a departure for KGaA, as previously its pharmaceutical products in the United States were offered through "alliances" with other companies. *See* attached as **Exhibit B** an article entitled "Merck KGaA's Oschmann Sees U.S. as New Emerging Market".

20.     Not surprisingly, this marked change in KGaA's business strategy, presence and growth in the United States and focus on immuno-oncology therapies has amplified the likelihood of

6

confusion with Merck and has recently resulted in significant actual confusion, as set forth herein.

21. Further exacerbating such likelihood of confusion, on information and belief, KGaA has engaged in an intentional, increasing and continuous effort to undermine Merck's rights and renown in the United States and to establish itself as "THE" Merck or the "ORIGINAL" Merck in the United States.

22. For example, KGaA recently launched a self-promotion campaign on websites directed to the United States dubbing KGaA as the "Original Merck" and featuring KGaA's U.S. employees declaring their pride in working for the "ORIGINAL" Merck.

23. KGaA has also recently launched a "Smarter, Together" campaign through which KGaA purports to have been doing business in the U.S. for over 125 years. KGaA's statements are, however, false because KGaA has not been doing business in the U.S. for that period of time. Rather, it is Merck Sharp & Dohme and its predecessors that have operated continuously in the United States for over 125 years, and built tremendous goodwill and recognition through such operations.

24. Indeed, on its own U.S. directed website, KGaA concedes that in 1917, Merck & Co. was a separate and independent company; that in 1945, KGaA lost its subsidiaries abroad; and that only in 1971 did KGaA "re-establish" itself in the U.S. market. *See* KGaA Corporate History page attached as **Exhibit C**. This self-described timeline makes KGaA's statement that it has been doing business in the United States for over 125 years literally false and/or misleading.

25. KGaA has also recently launched a rebranding initiative, including on KGaA's U.S. targeted websites. In describing the impetus for the rebranding, KGaA's CEO, Karl-Ludwig Kley, stated, "We want to be recognizable and remain visible as Merck <u>worldwide</u>" (*emphasis*

7

*added*).  *See* paragraph 52 below. KGaA's desire to be known as "Merck worldwide" includes the United States which is the largest consumer market in the world.

26.     These activities and others, as described in detail below, demonstrate KGaA's intent to use MERCK as a brand or trademark and trade name in the United States in violation of Merck's exclusive rights in the MERCK Marks and Trade Names (as defined below), to disregard its contractual obligations under the Coexistence Agreements, to mislead consumers in the United States and to usurp and dilute the goodwill associated with the MERCK trademark and trade name.

**Merck Marks and Trade Names**

27.     Merck has expended significant resources building the MERCK brand and as a result has acquired significant goodwill in the MERCK trademark and other trademarks containing the term Merck and the MERCK trade name and trade names containing the term Merck, including federal and common law rights as described below in paragraphs 28 through 29 (collectively, referred to herein as the "**MERCK Marks and Trade Names**").  Indeed, the MERCK Marks and Trade Names are ubiquitous in the pharmaceutical field in the United States.

28.     Merck Sharp & Dohme holds significant common law and statutory rights in the United States for the distinctive mark MERCK in connection with pharmaceutical products by virtue of long and extensive use and federal registration as pleaded hereinafter.  The MERCK trade name has also been used for over a century in the United States by Merck and related companies.

29.     Merck Sharp & Dohme is also the owner of a number of other trademarks and trade names consisting of or including the word "MERCK," including "MERCK," "MERCK & Design," "MERCK ACADEMY," "THE MERCK MANUAL," and "MERCK ONCALL." Various federal registrations owned by Merck Sharp & Dohme for marks containing the term

MERCK, many of which have achieved incontestability, are set forth in the chart below

(collectively referred to herein as the "**MERCK Registrations**").

| Mark | Goods & Services | Filing Date | Registration Date | Registration Number |
|------|-----------------|-------------|-------------------|---------------------|
| MERCK Stylized | Antiparasitics, cerebral depressants, depressants, motor depressants | 10/21/1915 | 02/15/1916 | 108566 |
| MERCK | full line of pharmaceuticals | 11/26/1996 | 06/30/1998 | 2169031 |
| MERCK ACADEMY | educational services, namely, a website providing scientific educational programs in the field of medicine and healthcare | 06/02/2010 | 12/28/2010 | 3897458 |
| MERCK ACADEMY and Design | Educational services, namely, a website providing scientific educational programs in the field of medicine and healthcare | 10/11/2010 | 04/05/2011 | 3940965 |
| MERCK ONCALL | providing medical and pharmaceutical information | 07/30/2001 | 02/11/2003 | 2687358 |
| MERCKVACCINES. COM | Telephone and on-line ordering services featuring vaccines<br><br>Providing information in the medical and health care fields | 05/21/2001 | 10/29/2002 | 2644267 |
| THE MERCK MANUAL | prints and publications, namely, series of books in the field of science and medicine | 08/20/1998 | 02/01/2000 | 2313554 |

| Mark | Goods & Services | Filing Date | Registration Date | Registration Number |
|------|------------------|-------------|-------------------|---------------------|
| THE MERCK VETERINARY MANUAL | prints and publications; namely, series of books in the field of science and medicine | 08/20/1998 | 02/01/2000 | 2313555 |

30.     Merck Sharp & Dohme's incontestable registrations for these marks constitutes conclusive evidence of: (a) the validity of the registration for the marks; (b) Merck Sharp & Dohme's ownership of the marks; and (c) Merck Sharp & Dohme's exclusive right to use the marks in commerce on or in connection with the goods and/or services specified in the registration. 15 U.S.C. §§ 1057 (b) and 1115 (a).

31.     Merck continues to use the MERCK Marks and Trade Names in the United States with various pharmaceutical products, as well as related goods and services.

32.     The MERCK Marks and Trade Names are well-known in the United States as a result of extensive and widespread sales and promotional efforts in relation to the various innovative medicines, vaccines, and animal health products, and other products and services offered in association with these marks and names.

33.     In 2013, seven of the pharmaceutical products offered by Merck were in the top 100 drugs by U.S. sales. *Fortune* magazine ranked Merck the 5th Most Admired Company within the Pharmaceutical Industry on its 2015 list of the World's Most Admired Companies. Merck was also awarded the Prix Galien USA Award for the Best Biotechnology Product of 2015, KEYTRUDA[®], the company's immuno-oncology product. This latest award for KEYTRUDA[®] is Merck's seventh Prix Galien USA award in nine years. The company was previously recognized for ZOSTAVAX[®] (Zoster Vaccine Live) (2013), VICTRELIS[®] (2012), ROTATEQ[®] (2010), ISENTRESS[®] (2008), and JANUVIA[®] and GARDASIL[®] (2007). In

addition, Corporate Responsibility Magazine named Merck to its 2015 fifteenth annual ranking of the 100 Best Corporate Citizens among leading public companies in the U.S., placing Merck in the No. 27th spot.

34. As a result of Merck's continuous use, advertising and promotion, *inter alia*, the MERCK Marks and Trade Names have acquired significant goodwill in the United States and, indeed, are famous.

## KGaA's Unauthorized and Infringing Uses of MERCK

35. Upon information and belief, KGaA is a manufacturer and exporter of chemical and pharmaceutical products ("**KGaA Goods**") distributed in the United States, including in New Jersey, and works through its affiliates, including EMD Millipore, EMD Serono and Sigma-Aldrich Corporation, to distribute KGaA Goods in the United States.

36. Under the 1970 Coexistence Agreement, KGaA is authorized to use "**E. Merck**" as all or part of a firm-name or corporate name provided such firm-name or corporate name is geographically identified with Germany as follows: "**E. Merck, Darmstadt, Germany**" all words being given equal prominence (*emphasis added*).

37. But KGaA has instead undertaken to use a trade name in the United States that consists solely of the term MERCK followed by a generic entity type designation (i.e., a KGaA or Kommanditgesellschaft Auf Aktien, German for "limited partnership on shares; business entity"). KGaA's uses of "MERCK," "Merck KGaA" and/or "Merck KGaA, Darmstadt, Germany" as set forth herein, have not been agreed to as permissible by Merck under the 1970 Coexistence Agreement which only agrees to use of "E. Merck, Darmstadt, Germany" as a firm-name or corporate name.

38. Upon information and belief, KGaA uses the trade name "Merck KGaA" not to merely identify the German entity organized under that corporate name but instead to associate MERCK, which carries with it the goodwill associated with Merck in the United States, with KGaA's U.S. operations (even though KGaA's U.S. operating companies purportedly use trade names containing the term EMD not MERCK).

39. In fact, KGaA's use of the designation "Merck KGaA" and its reference to itself simply as MERCK has become so prominent and widespread that its use of MERCK KGaA is intended to and functions as a cornerstone of its U.S. branding. In this way, KGaA's prominent use of MERCK functions as a trademark, in addition to a trade name, and constitutes, *inter alia*, trademark infringement, dilution and unfair competition.

40. Through this and other activities, KGaA holds itself out to be MERCK (and indeed the "Original" MERCK) thereby infringing and diluting the distinctive quality of the MERCK Mark and Trade Names. Further, KGaA's false statements and unauthorized uses of MERCK constitute false advertising and breach of the 1970 Coexistence Agreement.

### *Unauthorized Uses of MERCK on the Internet*

41. Merck has identified numerous unauthorized uses of MERCK by KGaA in the United States and on many occasions Merck has notified KGaA of such uses. Although KGaA has, in certain instances removed particular identified unauthorized uses, new unauthorized uses continue to be made, including, for example, unauthorized uses of MERCK on KGaA-owned websites located at www.emdgroup.com and www.emdmillipore.com. Examples of such uses are discussed in further detail below.

42. On information and belief, KGaA owns and operates websites located at the domain names www.merckgroup.com and www.emdgroup.com. Both these domain names are also

owned by KGaA. A user in the U.S. accessing the website located at www.merckgroup.com will be re-directed to the www.emdgroup.com website through means of geo-blocking. Additionally, the www.emdgroup.com site is targeted to users in the U.S. through content on the site.  As such, the www.emdgroup.com website is specifically targeted to users located in the United States. On information and belief, KGaA began targeting this website to users in the United States in 2013.

43.    In 2015, KGaA, on its U.S. targeted www.emdgroup.com site, discusses its new branding, namely the MERCK branding, in the United States next to the statement, "We are Merck."



44.     The home page for the www.emdgroup.com site also features the new branding and other unauthorized and infringing uses of MERCK as depicted below. This prominent usage of MERCK on a U.S. targeted website used to promote KGaA's goods and services in the United States is especially likely to cause confusion with Merck when used in conjunction with references to KGaA as the "Original" and other infringing uses of MERCK as depicted below.



45.     The Merck Builds Change brochure which promotes KGaA's opening of an innovation center and is available on the U.S. targeted www.emdgroup.com site also features unauthorized and infringing uses of MERCK, and includes contact information for comms@merckgroup.com, as depicted below.



# Merck Builds Change.
# And a Change of Thinking.



## Merck – Living Innovation.

Merck is a leading company for innovative and top-quality high-tech products in healthcare, life science, and performance materials. Around 39,000 Merck employees work in 66 countries to improve the quality of life for patients, to foster the success of customers, and to help meet global challenges. In 2014, we generated sales of € 11.3 billion with our three business sectors.

Never stop learning. That's the only way. To this day, we derive our power to grow from the balance between the old and the new, between tradition and innovation. The Merck Way – or the secret of how a company has managed to remain successful in the marketplace even after more than 340 years – is based on three principles: Sustain. Change. Grow.



46.     An online supplier manual also available on the U.S. targeted www.emdgroup.com site features unauthorized and infringing uses of MERCK, as depicted below:



47.     Screenshots of the home page from the U.S. targeted www.emdgroup.com site and other pages appearing on the site also prominently featured infringing uses of MERCK and statements regarding KGaA being the "Original".







48.     Screenshots of the Consumer Health page from the U.S. targeted www.emdgroup.com site also prominently features infringing uses of MERCK and trademarks containing MERCK in the promotion of KGaA's product SedalMerck®, as depicted below.   The term SedalMerck is followed by a trademark registration symbol.





49. On information and belief, KGaA also owns and operates the website located at the domain name www.displayingfutures.com which is accessible to users in the United States and contains content related to U.S. specific activities. This domain name www.displayingfutures.com is owned by KGaA. This website promotes a 2015 symposium that was held in the United States and includes unauthorized use of MERCK alone as depicted below.



***Unauthorized Uses of MERCK on Social Media***

50.     KGaA has also made unauthorized uses of MERCK on social media. For example, KGaA's YouTube channel, Facebook and Twitter pages are each accessible in the United States and feature prominent use of MERCK as shown below.





23

*Unauthorized Uses of MERCK in Press Releases Directed to U.S. Consumers*

51.     KGaA has also recently issued numerous press releases directed to U.S. consumers which contain prominent unauthorized uses of MERCK and which not surprisingly have caused considerable confusion.

52.     For example, KGaA issued a news release available on the U.S. facing website, www.emdgroup.com, titled "Merck Brand Relaunched." The press release is directed to a U.S. audience and prominently features unauthorized uses of MERCK. Indeed, the title of the article explicitly acknowledges that KGaA is relaunching its MERCK trademark (or "brand") and goes on to note that it wants to be known as MERCK worldwide so as to strengthen its well-known brand name.



53.    Another KGaA news release directed to a U.S. audience prominently featured unauthorized uses of MERCK in a description of KGaA's placement of a U.S. bond as shown below.  It is notable that in the news release, relating to a U.S. bond, the CFO of KGaA is quoted as saying "MERCK is an attractive name for investors also outside of Europe."



54.    Another KGaA news release also directed to a U.S. audience featured unauthorized uses of MERCK and described KGaA's push to "Accelerate Presence in Immuno-Oncology", a field in which it is attempting to compete directly with Merck, as shown below.  As noted in the KGaA news release, the activities "accelerate Merck's entry into the U.S. oncology market."



*Unauthorized Uses of MERCK at Conferences and Presentations*

55.   Upon information and belief, a booth at a 2015 Salesforce conference in New York prominently featured unauthorized uses of MERCK.  KGaA employees at the booth referred to themselves as "U.S. Merck" or "Merck". The conference keynote presentation included a video promoting a KGaA "Merck Companion App." Exemplary unauthorized uses of MERCK from the conference are depicted below.





56.     At another Salesforce conference in New York a large banner was displayed prominently featuring an unauthorized use of MERCK associated with KGaA.  Such use is particularly concerning as the background color of the banner is virtually the identical shade of green used in connection with Merck's corporate logo as depicted in paragraph 80 below.



57.    A 2015 Salesforce conference in San Francisco also prominently featured unauthorized uses of MERCK as depicted below and certain of the uses featured the same shade of green as Merck's corporate logo.



58.     Inese Lowenstein, a KGaA employee, participated in a welcome address at a Harvard University conference in Chicago, Illinois, and was introduced in the promotional materials as "Executive Vice President, Merck KGaA" and former "Head of Merck's Pigments & Cosmetics business unit".

59.     Additionally, KGaA promoted its participation and presentation at the 2016 JP Morgan Healthcare Conference in San Francisco, California on KGaA's Twitter page using the hash tag MERCK, as depicted below, and referring to its presentation as the "#Merck-presentation" in multiple tweets. Merck was also participating and presenting at the same conference which made KGaA's unauthorized use of MERCK in connection with the conference all the more likely to result in confusion.





*Unauthorized Use of MERCK on Products*

60.     The EMD Millipore website which on information and belief is owned and operated by KGaA, is specifically directed to U.S. users and located at the domain name www.emdmillipore.com, also owned by KGaA, and demonstrates that KGaA is currently offering and has offered goods in the United States under marks which contain the term MERCK and/or which are confusingly similar to the MERCK Marks and Trade Names.  Examples of such unauthorized and infringing uses on this website include use of the mark MERCKOGNOST (which appears followed by the ® symbol used to identify registered trademarks) and MRCK PROTEIN as shown below.



## KGaA's Intends to Create Confusion

### *KGaA's Original Campaign*

61.     KGaA has encouraged employees at all levels, including those in the U.S., to promote KGaA as the "Original" as shown below on the screenshots from KGaA's U.S. facing website located at www.emdgroup.com and its www.theoriginal.company website, also intended for the United States.





62.     Senior personnel from KGaA have also perpetuated this misleading notion that KGaA is the "Original Merck" in presentations and interviews in the United States, as illustrated by an interview with Karl-Ludwig Kley, Chairman of the Executive Board of KGaA in the USA on September 22, 2014, in which he stated, "Well, before turning to answer your question let me say this. We are currently in the United States, so whenever I refer to Merck, which is my company, I mean Merck KGaA, Darmstadt, Germany. The Original Merck." Attached as **Exhibit D** is a transcript of this interview.

63.     Upon information and belief, personnel for KGaA and/or its U.S. operating companies introduced themselves at a 2015 Bio-Pharma Sustainability Conference as the "Original Merck" and then referred to Merck as KGaA's "younger brother/sister" suggesting some affiliation where there is none.

64.     The acts by Defendant as described above, evidence, *inter alia*, KGaA's concerted attempt to not only confuse consumers into believing that Defendant and its goods and services

are produced by or otherwise associated with Merck whose famous MERCK trademark has obtained an iconic status over decades of continuous use, but also dilute the distinctive quality of the MERCK trademark in the United States.

### *KGaA's False and Misleading 125 Years Campaign*

65.    As discussed above, KGaA has started an advertising campaign which centrally features the false statement "125 Years in the U.S." ("**The 125 Years Campaign**"). Not only is this statement literally false and misleading, given that by its own admission KGaA did not re-enter the U.S. market until 1971, but such campaign is accompanied by prominent unauthorized uses of MERCK as depicted below.



66.    The false statement "125 Years in the U.S." suggests that KGaA has been operating in the United States for over a century, when in fact, it is not KGaA who has such a long-established presence in the United States, but, instead, Merck.

67.    Such statement is likely to deceive consumers as to KGaA's history in the United States and trades off of the good will associated with Merck, through lessening such goodwill and its association with Merck.

68.     KGaA ran an advertisement for The 125 Years Campaign at the 2015 BIO International Convention in Philadelphia, which, upon information and belief, hosted 20,000 attendees and at which KGaA also had a booth. The KGaA ad prominently featured the false and misleading statement, "125 Years in the U.S.," and featured infringing and unauthorized use of MERCK as shown below.



69.     KGaA also ran a false and misleading advertisement for The 125 Years Campaign in the Washington Post, claiming that KGaA has executed a "great business strategy" for 125 years and that KGaA has "been asking [questions] <u>relentlessly</u> for 125 years here in the US" as depicted below (emphasis added).



## *KGaA's Registration of Infringing Domain Names*

70.     KGaA has registered domain names that are virtually identical to Merck's trademark registration for THE MERCK MANUAL.  KGaA has registered the following domain names: www.merckmanual.jobs, www.merckmanuals.jobs, www.merck-manual.jobs, www.merck-manuals.com, www.merckmanual.org, www.merck-manual.adult, www.merck-manual.porn, www.merckmanual.adult, www.merckmanual.porn, www.merck-manuals.adult, www.merck-manuals.porn, www.merckmanuals.adult, and www.merck-manuals.porn. Users accessing the websites located at these domain names receive a message that they "will be directed to the Merck Group website" as shown below:



71.     THE MERCK MANUAL offered by Merck is one of the oldest, most widely used, comprehensive medical resources available to both professionals and consumers.  Merck Sharp & Dohme is also the owner of U.S. Reg. No. 2313554 for THE MERCK MANUAL.

72.     KGaA has registered and used these domain names comprised solely of or prominently using the mark MERCK MANUAL(S) in bad faith to redirect users searching for THE MERCK MANUAL, which is associated with Merck, to KGaA's website.

### *Evidence of Actual Confusion*

73.     Not surprisingly given KGaA's recent focus on developing its emerging U.S. business, its concerted efforts to identify itself as being the "ORIGINAL" or "THE" Merck in the United States and its focus on immuno-oncology therapies which directly compete with Merck, KGaA's use of MERCK has resulted in numerous instances of actual confusion in the United States.

74.     For example, at least one U.S. researcher believed she was communicating with Merck regarding an oncology research grant when she was actually communicating with KGaA at the email address goi_emdserono@merckgroup.com.

75.     In another example, screenshots of a U.S. based social media page maintained by KGaA as part of the recently formed More than a Mother initiative (which name is confusingly similar to Merck's Merck for Mothers initiative) demonstrate both infringing uses of MERCK and evidence of actual confusion as shown below, with at least one Twitter user (ARC Fertility located in California) attributing the More than a Mother Campaign to Merck.



76.     Further, KGaA's infringing uses of MERCK as discussed herein, particularly in the context of its more recent shift in business focus to the immuno-oncology field, has created an environment in which actual confusion is virtually inevitable such that the media mistakes the two companies, further perpetuating confusion.

77.     For example, a U.S. based media source reporting on KGaA's collaboration with Pfizer regarding the initiation of Phase III First-Line Trial of Avelumab in Patients in non-small cell lunch cancer (NSCLC) mistakenly referred to KGaA as "Merck". *See* article attached as **Exhibit E.**

78.     Yet another U.S. based media source mistakenly reported in October 2015 that "Merck & Co. Inc. (NYSE: MRK) announced the relaunch of its brand identity. The fundamental revision of the visual appearance as well as the introduction of a new logo reflects the transformation into a global science and technology company." Instead, it was KGaA who announced the launch of its brand identity in October 2015. *See* article attached as **Exhibit F** and paragraph 43.

79.    News reports on KGaA's development of an anti-PD-L1 immuno-oncology therapy also referenced Merck and Merck's ticker (NYSE: MRK) but referred to it as a "German healthcare company" and "German Pharmaceutical Company" and referenced KGaA's recent acquisition of Sigma-Aldrich Corporation.  As shown below, such reports mistakenly attribute KGaA's "less than impressive" results to Merck & Co., Inc.



80.    News reports reporting negatively on KGaA's Avelumab drug, titled "Avelumab in Lung is Unimpressive," also mistakenly associated Merck, its distinctive corporate logo and Merck & Co., Inc.'s ticker (NYSE: MRK) in a story about Avelumab, KGaA's anti-PD-L1 immuno-oncology therapy (which therapy is a rival to Merck's anti-PD-1 immunotherapy, although it

targets a different molecule in the PD-1/PD-L1 pathway) and depicted Merck's logo as the entity involved as shown below.



81.     Merck Sharp & Dohme has priority of use for the Merck Marks and Trade Names over KGaA's use of the Merck KGaA trade name and trademarks containing MERCK, or confusingly similar marks, in the United States.

82.     Defendant had both actual and constructive knowledge of Merck Sharp & Dohme's ownership and registration of the MERCK Marks and Trade Names in the United States, including the MERCK mark in U.S. Reg. No. 108,566 by virtue of the MERCK Registrations and the longstanding communications and Coexistence Agreements between Merck and KGaA.

83. Given Merck's prior and substantial use of the MERCK Marks and Trade Names in connection with its goods and services in the United States, Defendant's unauthorized use of MERCK, as set forth herein, has and will likely continue to, *inter alia*, confuse or deceive consumers as to source, sponsorship or approval of Defendant's products, and consumers are likely to erroneously believe that Merck sponsors or is somehow affiliated with Defendant.

84. KGaA's unauthorized use of MERCK Marks and Trade Names as described in paragraphs 35 through 80 are collectively referred to herein as **KGaA's Unauthorized Uses**.

85. Unless this Court restrains the Defendant's acts complained above herein, Defendant will continue to cause irreparable injury to Merck and to the public for which there is no adequate remedy at law.

## <u>COUNT ONE</u>
## FEDERAL TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1)

86. Plaintiffs repeat paragraphs 1 through 85 as if fully set forth herein.

87. Merck Sharp & Dohme owns the MERCK Registrations and such registrations are valid and enforceable.

88. The marks and trade names which are the subject of KGaA's Unauthorized Uses are confusingly similar to the marks in the MERCK Registrations in appearance, sound, and commercial impression.

89. KGaA's Unauthorized Uses are likely to cause confusion or mistake with the marks which are the subject of the MERCK Registrations, or to deceive as to source, affiliation, or sponsorship with Merck, in violation of the Lanham Act, 15 U.S.C. § 1114.

90. Merck Sharp & Dohme has been and/or is likely to be damaged by Defendant's infringement in an amount to be determined at trial.

91.     Defendant's acts have been committed with the knowledge of Merck Sharp & Dohme's exclusive rights and goodwill in the MERCK Registrations and, Defendant's conduct is willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

92.     As a result of Defendant's trademark infringement, Defendant has caused, and will continue to cause, irreparable harm to Merck Sharp & Dohme and the goodwill associated with the MERCK Registrations for which Merck Sharp & Dohme has no adequate remedy at law. Thus, Merck Sharp & Dohme is entitled to, *inter alia*, injunctive relief.

## COUNT TWO
## FEDERAL UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

93.     Plaintiffs repeat paragraphs 1 through 92 as if fully set forth herein.

94.     Merck has common law and federal trademark rights in the MERCK Marks and Trade Names, which are uniquely associated with Merck as a source of goods and services offered in connection with the MERCK Marks and Trade Names.

95.     The marks and trade names which are the subject of KGaA's Unauthorized Uses are confusingly similar to the MERCK Marks and Trade Names in appearance, sound, and commercial impression.

96.     KGaA's Unauthorized Uses  are likely to cause confusion or mistake with the MERCK Marks and Trade Names, or to deceive as to source, affiliation, connection, association, or sponsorship of Defendant with Merck, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

97.     KGaA's Unauthorized Uses are confusingly similar to the MERCK Marks and Trade Names and constitute unfair competition and Merck has been, and will continue to be, damaged by Defendant's acts in an amount to be determined at trial.

98.     Defendant's conduct is willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

99.     Defendant's acts of unfair competition have caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK Marks and Trade Name, for which Merck has no adequate remedy at law.  Thus, Merck is entitled to, *inter alia*, injunctive relief.

## COUNT THREE
## FEDERAL TRADEMARK DILUTION UNDER 15 U.S.C. § 1125(c)

100.    Plaintiffs repeat paragraphs 1 through 99 as if fully set forth herein.

101.    Merck has common law and federal trademark rights in the MERCK word mark, which is uniquely associated with Merck as a source of the goods offered in connection with the mark.

102.    The MERCK word mark is highly distinctive in connection with the goods and services offered under the mark.

103.    The MERCK word mark is widely recognized by the general consuming public of the United States as a designation of source for Merck's goods and is famous within the meaning of 15 U.S.C. § 1125(c).

104.    Merck has sold goods and rendered services under the MERCK word mark across the United States.

105.    The MERCK word mark was famous, within the meaning of 15 U.S.C. § 1125(c) long before KGaA's Unauthorized Uses began, which uses are virtually identical to the MERCK word mark.  KGaA's Unauthorized Uses have created and are likely to create an association with the MERCK word mark, impair the distinctiveness of the famous MERCK word mark, and cause dilution by blurring and tarnishment of the MERCK word mark in violation of the Lanham Act, 15 U.S.C. § 1125(c).

106.    Merck has been, and will continue to be, damaged by Defendant's acts causing dilution of the MERCK word mark in an amount to be determined at trial.

46

107. Defendant's conduct is willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

108. Defendant's acts in violation of the Lanham Act, 15 U.S.C. § 1125(c) have caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK word mark, for which Plaintiffs have no adequate remedy at law. Thus, Plaintiffs are entitled, *inter alia*, to injunctive relief.

## COUNT FOUR
### TRADEMARK INFRINGEMENT UNDER N.J. STAT. § 56.3-13.16

109. Plaintiffs repeat paragraphs 1 through 108 as if fully set forth herein.

110. This count arises under N.J. Stat. § 56.3-13.16 for infringement of the MERCK Marks and Trade Names.

111. As set forth above, Defendant has used, without Merck's consent, MERCK as a trademark or trade name, or confusingly similar trademarks and trade names, in connection with KGaA's Unauthorized Uses in this State, which has caused and is likely to cause consumer confusion, in violation of New Jersey state law.

112. Merck has common law and federal trademark rights in its MERCK Marks and Trade Names, which are uniquely associated with Merck as a source of the goods and services offered in connection with the MERCK Marks and Trade Names.

113. Merck has been and/or is likely to be damaged by Defendant's infringement in an amount to be determined at trial.

114. Defendant's actions as described above are in violation of N.J. Stat. § 56.3-13.16, as Defendant has intentionally infringed and will continue to infringe Merck's MERCK Marks and Trade Names.

115.   Defendant is liable to Merck for damages in an amount yet to be ascertained and an injunction against its foresaid actions. Such damage may be trebled in the discretion of the Court.

<u>COUNT FIVE</u>
**TRADEMARK DILUTION UNDER N.J. STAT. § 56.3-13.20**

116.   Plaintiffs repeat paragraphs 1 through 115 as if fully set forth herein.

117.   This count arises under N.J. Stat. § 56.3-13.20 for dilution of the MERCK word mark.

118.   As set forth above, upon information and belief, Defendant has used, without Merck's consent, the MERCK word mark in connection with KGaA's Unauthorized Uses in this State, which has impaired and which is likely to impair the distinctiveness of the MERCK word mark, in violation of New Jersey state law.

119.   Merck has common law and federal trademark rights in the MERCK word mark, which is uniquely associated with Merck as a source of the goods and services offered in connection with the MERCK word mark.

120.   The MERCK word mark is highly distinctive in connection with the goods and services offered under the mark.

121.   The MERCK word mark is widely recognized by the general consuming public of the United States as a designation of source for Merck's goods and services and is famous within the meaning of N.J. Stat. § 56.3-13.20.

122.   The MERCK goods and services have been offered, sold, and rendered under the MERCK word mark across the United States and in New Jersey for decades.

123.   The MERCK word mark was famous in New Jersey within the meaning N.J. Stat. § 56.3-13.20, long before KGaA's Unauthorized Uses began. KGaA's Unauthorized Uses have created and are likely to create an association with the MERCK word mark, and thus cause dilution by blurring and tarnishment of the MERCK word mark in violation of N.J. Stat. § 56.3-13.20.

124. Merck has been, and will continue to be, damaged by Defendant's acts causing dilution of the MERCK word mark in an amount to be determined at trial.

125. Defendant's conduct is willful, deliberate, intentional, and/or in bad faith, making this an exceptional case. Defendant acts in violation of N.J. Stat. § 56.3-13.20 have caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK word mark, for which Plaintiffs have no adequate remedy at law. Thus, Plaintiffs are entitled to, *inter alia*, injunctive relief.

**COUNT SIX**
**UNFAIR COMPETITION UNDER N.J. STAT. § 56.4-1**

126. Plaintiffs repeat paragraphs 1 through 125 as if fully set forth herein.

127. This count arises under N.J. Stat. § 56.4-1 for appropriation of the MERCK Marks and Trade Names.

128. As set forth above, KGaA's Unauthorized Uses are likely to cause confusion or mistake with the MERCK Marks and Trade Names, or to deceive as to source, affiliation, connection, association, or sponsorship of Defendant with Merck, in violation of New Jersey state law.

129. Merck has common law rights in the MERCK Marks and Trade Names, which are uniquely associated with Merck as a source of goods and services offered in connection with the MERCK Marks and Trade Names.

130. KGaA's Unauthorized Uses are confusingly similar to the MERCK Marks and Trade Names and constitute unfair competition and Merck has been and/or will likely be damaged by Defendant's acts in an amount to be determined at trial.

131. Defendant's conduct is willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

132.    Defendant's acts of unfair competition have caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK Marks and Trade Names, for which Merck has no adequate remedy at law.  Thus, Merck is entitled to, *inter alia*, injunctive relief.

### COUNT SEVEN
### COMMON LAW UNFAIR COMPETITION

133.    Plaintiffs repeat paragraphs 1 through 132 as if fully set forth herein.

134.    This count arises under the common law of unfair competition of the State of New Jersey.

135.    Merck has common law rights in its MERCK Marks and Trade Names, which are uniquely associated with Merck as the source of goods and services offered in connection with the MERCK Marks and Trade Names.

136.    KGaA's Unauthorized Uses have caused and are likely to cause confusion or mislead consumers and constitute unfair competition and Merck has been and/or will likely be damaged by Defendant's acts in an amount to be determined at trial.

137.    Defendant's conduct is willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

138.    Defendant's acts of unfair competition have caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK Marks and Trade Names, for which Merck has no adequate remedy at law.  Thus, Merck is entitled to injunctive, as well as financial, relief.

### COUNT EIGHT
### FEDERAL FALSE ADVERTISING

139.    Plaintiffs repeat paragraphs 1 through 138 as if fully set forth herein.

140.    This count arises under the Lanham Act 15 U.S.C. § 1125 (a)(1)(B) for false advertising.

141.     KGaA, through The 125 Years Campaign, has used in commerce false or misleading descriptions of fact and/or false or misleading representations of fact, in connection with its goods and/or services, which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of KGaA's goods, services, and/or commercial activities, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

142.     Defendant's false statements about its own products in commercial advertisements were literally false and willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

143.     Merck has been, and will continue to be, damaged by KGaA's acts of false advertising in an amount to be determined by trial.

144.     As a result of KGaA's acts, KGaA has caused, and will continue to cause, irreparable harm to Merck, for which Merck has no adequate remedy at law. Thus, Merck is entitled to injunctive, as well as financial, relief.

## <u>COUNT NINE</u>
## <u>DECEPTIVE TRADE PRACTICES UNDER N.J. STAT. § 56.8-2</u>

145.     Plaintiffs repeat paragraphs 1 through 144 as if fully set forth herein.

146.     This count arises under N.J. Stat. § 56:8-2 for deceptive trade practices.

147.     KGaA, through The 125 Years Campaign, has used in commerce false or misleading descriptions of fact and/or false or misleading representations of fact, in connection with its goods and/or services, which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of KGaA's goods, services, and/or commercial activities, in violation of New Jersey state law.

148.    Defendant's false statements about its own products in commercial advertisements were literally false and willful, deliberate, intentional, and/or in bad faith, making this an exceptional case.

149.    Merck has been, and will continue to be, damaged by KGaA's acts of false advertising in an amount to be determined by trial.

150.    As a result of KGaA's acts, KGaA has caused, and will continue to cause, irreparable harm to Merck, for which Merck has no adequate remedy at law. Thus, Merck is entitled to injunctive, as well as financial, relief.

### COUNT TEN
### BREACH OF CONTRACT

151.    Plaintiffs repeat paragraphs 1 through 150 as if fully set forth herein.

152.    This count arises under the common law of breach of contract of the State of New Jersey.

153.    KGaA is bound by the 1970 Coexistence Agreement which, *inter alia*, recognizes Merck's exclusive rights to the trademark MERCK in the United States and prohibits KGaA from using or attempting to acquire rights in any trademark containing MERCK in the United States.

154.    The Defendant has breached the contract through, *inter alia*, Defendant's use of MERCK and/or terms containing MERCK as trademarks and KGaA's Unauthorized Uses in the United States.

155.    Defendant's breach of contract has caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK Marks and Trade Names, for which Merck has no adequate remedy at law.  Thus, Merck is entitled to specific performance, injunctive as well as financial, relief.

**COUNT ELEVEN**
**CYBERSQUATTING**

156.    Plaintiffs repeat paragraphs 1 through 155 as if fully set forth herein.

157.    This count arises under the Anticybersquatting Consumer Protection Act 15 U.S.C. § 1125(d).

158.    As set forth above, Defendant's registration of domain names, namely, www.merckmanual.jobs, www.merckmanuals.jobs, www.merck-manual.jobs, www.merck-manuals.com, www.merckmanual.org, www.merck-manual.adult, www.merck-manual.porn, www.merckmanual.adult, www.merckmanual.porn, www.merck-manuals.adult, www.merck-manuals.porn, www.merckmanuals.adult, and www.merck-manuals.porn each of which immediately redirects to www.emdgroup.com and is virtually identical to Merck's trademark registration in the MERCK MANUAL constitutes bad faith use and registration in violation of the Anticybersquatting Consumer Protection Act 15 U.S.C. §1125(d).

159.    Defendant's acts of cybersquatting have caused, and will continue to cause, irreparable harm to Merck and the goodwill associated with the MERCK MANUAL marks, for which Merck has no adequate remedy at law.  Thus, Merck is entitled to forfeiture and cancellation of Defendant's domain name registration and transfer of such domain name registration to Merck.

**PRAYER FOR RELIEF**

WHEREFORE, Merck respectfully requests that this Court:

1.    Enter a judgment against Defendant on all counts.

2.    Preliminarily and permanently enjoin Defendant from: directly or indirectly using, displaying, advertising, promoting, registering, applying to register, transferring, or including on or in connection with any products, services, promotional items, domain names or websites or

other commercial activities, the MERCK Marks and Trade Names, or any confusingly similar marks or trade names, or otherwise engaging in any further acts of trademark infringement, dilution or unfair competition against Merck or aiding, abetting, encouraging, or inducing another to do any of the acts herein enjoined.

3.      Preliminarily and permanently enjoin Defendant from using in commerce false or misleading descriptions of fact and/or false or misleading representations of fact, in connection with its goods and/or services, which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of KGaA's goods, services, and/or commercial activities, including without limitation those statements in The 125 Years Campaign.

4.      Order cancellation and forfeiture of Defendant's registration of domain names containing the MERCK MANUAL trademark or confusingly similar marks and transfer of such registrations to Merck.

5.      Find that this is an exceptional case within the meaning of 15 U.S.C. § 1117.

6.      Order an accounting and for Defendant to pay over to Merck:

    a.      All monetary gains, profits, and advantages derived by Defendant from the acts complained of herein;

    b.      Damages incurred by Merck, including enhanced damages (up to treble damages) as authorized by 15 U.S.C. § 1117 and N.J. STAT. § 56.4-2;

    c.      Punitive and exemplary damages to be determined by the Court after a full hearing on the merits; and

    d.      Merck's costs and disbursements in this action, including reasonable attorneys' fees and prejudgment interest.

7.      Require Defendant and all persons acting for or in active concert or participation with them, to remove from any websites or social media and to deliver up for destruction any and all products, literature, forms, promotional materials, prints, advertising matter, circulars, stationery, labels, tags, wrappers, packaging, places stencils, signs and other materials used in the preparation thereof, bearing the MERCK Marks and Trade Names, or any confusingly similar marks or trade names.

8.      Award Merck any other or further relief that this Court may deem just or appropriate.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


                              Respectfully Submitted,


Dated: January 15, 2016          By: s/ John E. Flaherty
                                 John E. Flaherty
                                 Ravin R. Patel
                                 McCARTER & ENGLISH, LLP
                                 Four Gateway Center
                                 100 Mulberry Street
                                 Newark, New Jersey 07102
                                 (973) 622-4444

                                 Raymond A. Kurz
                                 Anna Kurian Shaw
                                 Hogan Lovells US LLP
                                 555 Thirteenth St. NW
                                 Washington, D.C. 20003
                                 (202) 637-5600

                                 *Attorneys for Plaintiffs,*
                                 *Merck & Co., Inc., and*
                                 *Merck Sharp & Dohme Corp.*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2, we hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: January 15, 2016

By: s/John E. Flaherty
John E. Flaherty
Ravin R. Patel
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

Raymond A. Kurz
Anna Kurian Shaw
Hogan Lovells US LLP
555 Thirteenth St. NW
Washington, D.C. 20003
(202) 637-5600

*Attorneys for Plaintiffs,
Merck & Co., Inc., and
Merck Sharp & Dohme Corp.*

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 201.1</u>

Pursuant to Local Civil Rule 201.1, we hereby certify the above-captioned matter is not subject to compulsory arbitration in that, *inter alia*, Plaintiffs seek non-monetary relief and the amount in controversy is more than the $150,000 threshold exclusive of interest and costs and any claim for punitive damages.

Dated: January 15, 2016

By: <u>s/ John E. Flaherty</u>
John E. Flaherty
Ravin R. Patel
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

Raymond A. Kurz
Anna Kurian Shaw
Hogan Lovells US LLP
555 Thirteenth St. NW
Washington, D.C. 20003
(202) 637-5600

*Attorneys for Plaintiffs,*
*Merck & Co., Inc., and*
*Merck Sharp & Dohme Corp.*

# EXHIBIT A

A G R E E M E N T   made January 1, 1970

between

MERCK & CO., INC. of Rahway, New Jersey, USA

and

E. MERCK of Darmstadt, Germany.

## Definitions:

1.) a)   "Merck & Co." as used herein shall mean Merck & Co., Inc. and its subsidiaries and affiliates.

   b)   "E. Merck" shall mean E. Merck an "offene Handelsgesellschaft" according to German Law and its subsidiaries and affiliates.

   c)   "Subsidiaries" and "affiliates" include any corporation, company, firm or individual subject to the control of one of the parties including particularly Merck & Co. Limited, Montreal, in the case of Merck & Co.

   d)   "Germany" as used herein means the territory of the Federal Republic of Germany, of Berlin and of the German Democratic Republic to include such other territories as may belong to any of the above or to a future reunited Germany at the effective date of their political union.  Such other territories shall include only these which belonged to Germany in 1935.

   e)   "The United States" as used herein means the United States and all its present territories, possessions and dependencies, including but not limited to Puerto Rico, Panama Canal Zone and Virgin Islands.

-2-

f) "All other countries" as used herein means all
countries of the world other than the United States,
Canada, Germany, Cuba and the Philippines.

### United States and Canada:

2.) a) Merck & Co. will not object to the use of the name
E. Merck in the United States and Canada by E. Merck
as all or part of a firm-name or corporate name
provided such names are geographically identified
with Germany as follows: "E. Merck, Darmstadt,
Germany" all words being given equal prominence.

b) E. Merck recognizes the exclusive right of Merck & Co.
to the use of the trademark Merck in the United States
and Canada and in such countries will not use or
attempt to acquire rights in any trade mark containing
Merck.

### Germany:

3.) a) E. Merck will not object to the use in Germany by
Merck & Co. of

(i) Merck & Co., Inc. or Merck & Co. Limited as all
or part of a firm name or corporate name provided
such names are geographically identified with the
United States or Canada as follows: "Merck & Co.,
Inc., Rahway, N.J., U.S.A.", and "Merck & Co.
Limited, Montreal, Canada", all words being given
equal prominence.

-3-

(ii) "Merck Sharp & Dohme" as all or part of a firm name, corporate name or name of a corporate subdivision, provided such names are geographically identified with a country other than Germany, all words being given equal prominence.

b) Merck & Co. recognizes the exclusive right of E. Merck to the use of the trademark Merck in Germany and in such country will not use or attempt to acquire rights in any trademark containing Merck.

All other countries:

4.) In all other countries E. Merck recognizes that "Merck Sharp & Dohme" as a trademark or name is not confusingly similar to any of the trademarks or names used or owned by E. Merck and E. Merck will not object to Merck & Co.'s use and registration of Merck Sharp & Dohme as all or part of a trademark, tradename or corporate name. When requested E. Merck shall so state in writing. The embellishments of design of such trademarks shall not imitate marks owned by E. Merck.

5.) In all other countries E. Merck will not object to the use by Merck & Co. as all or part of a firm-name or corporate name of "Merck & Co., Inc." used in association with words such as "Rahway, N.J., U.S.A." which identify it geographically with the United States or "Merck & Co. Limited" used in association with words such as "Montreal Canada" which identify it with Canada, all words being given equal prominence.

-4-

6.) In all other countries Merck & Co. recognizes that E. Merck is entitled to use the word "Merck" or combinations such as "E. Merck" as a trademark or name provided that any such marks or names adopted in the future shall not be confusingly similar to marks or names adopted or used by Merck & Co. under Paragraphs 4 and 5 above. When requested Merck & Co. shall so state in writing.

7.) In all other countries Merck & Co. has undertaken to cancel all existing registrations, withdraw all applications and discontinue all use of the trademarks "Merck", "Merck Cross" and "MerckMerckMerck".

8.) In all other countries Merck & Co. has undertaken to discontinue all use of the following corporate names:
Merck (Pan America) Inc.
Industrias Pharmaceuticas Merck (Norte Americana) S.A.
Merck & Co. (Great Britain) Ltd.

9.) It is understood that the requirements of paragraph 8 hereof will be fulfilled whereever the words "Merck Sharp & Dohme" are substituted for the word "Merck".

10.) Cuba and the Philippines.
Merck & Co. and E. Merck each recognize the concurrent right of the other to the unrestricted use of Merck as a tradename and as a trademark in Cuba and the Philippines; each will take appropriate steps to distinguish its goods from those of the other and avoid confusion.

11.) Merck & Co. and E. Merck will cooperate in the prompt termination of all litigation now pending between them involving trademarks or tradenames containing Merck. Each party will defray all expenses previously incurred to include such expenses as have already been paid or are still to be paid in compliance with a court decree already issued.

12.) It is understood that Merck & Co. had submitted the original agreement of September 12, 1955 — which is herewith replaced by this new agreement — to the United States Department of Justice for review and with the concurrence of the Department obtained an appropriate court order that Merck & Co. is authorized to execute and carry out the original agreement. This new agreement, which provides for formalistic amendments caused by a change of the company name of the German party, has been submitted to the United States Department of Justice for review. The Department has agreed that since the changes are formal only, they do not require approval by the Court.


Merck & Co., Inc.                                    E. Merck

By _Fred Bartenstein_                        By _____
   Fred Bartenstein                              Dr. Bartling        Emig
   Administrative Vice President


-6-

# EXHIBIT B

**Bloomberg**Business

# Merck KGaA's Oschmann Sees U.S. as New Emerging Market

by Allison Connolly
July 1, 2013 — 6:34 AM EDT

July 1 (Bloomberg) -- Merck KGaA, the German drugmaker whose U.S. unit was expropriated almost a century ago, is turning back to that market as competitors focus on emerging economies in Asia and South America.

"For us, the U.S. is an emerging market," Stefan Oschmann, head of pharmaceuticals, said in an interview. "We have huge growth potential in the U.S."

Merck KGaA is focusing on one of the world's most profitable drug markets as sales of its best-selling medicines slow and as a late-stage drug pipeline dries up. The Darmstadt-based company hasn't had a treatment approved since the go-ahead in 2003 for the cancer drug Erbitux, which it sells under license outside North America. Its next market candidate won't be considered by regulators until 2016.

The German company's growth in North America was curtailed when its U.S. subsidiary was expropriated during World War I. Since then, that business, Merck & Co., has blossomed into the country's second-largest drugmaker. While the two pharmaceutical companies now aren't related, the German drugmaker is relying on Oschmann, who formerly was president of emerging markets at Whitehouse Station, New Jersey-based Merck & Co., to revamp its drug development programs.

## Beefing Up

Oschmann said Merck plans to beef up its early stage pipeline through licensing and research alliances and is looking for bolt-on acquisitions while reviewing assets. He was hired in 2011 following the failure of the company's multiple sclerosis pill cladribine. Since then, Merck has closed sites, cut and transferred jobs and refocused research on cancer, immunology and neurodegenerative disease.

The stock rose 1.2 percent to 118.50 euros at 12:33 p.m. in Frankfurt, bringing the 12-month return to 53 percent. That compares with a 26 percent gain in the Bloomberg Europe Pharmaceutical Index, including reinvested dividends.

Case 2:16-cv-08364-ESK-MAH Document 24-1 Filed 06/30/17 Page 66 of 87 PageID: 66

The pipeline was "skewed" about 2 1/2 years ago, with many "high-risk" programs in the third and final stage of development, requiring big investments, Oschmann said. The company hadn't spent as much on earlier stages of development nor sought licenses for many other drugs, according to the executive.

## New Products

"This is what we wanted to change," he said. "Being successful in the U.S. means that we have to introduce new products."

Merck said in May it's more than doubling the size of its venture capital fund MS Ventures to 100 million euros ($131 million). Oschmann traveled to Boston in recent weeks to meet with biotechnology companies about the benefits of working with his company.

The German drugmaker has slowly built back a presence in North America, where it had pharmaceutical sales of 1.3 billion euros last year. Still, its product offering in that market is "weak," as traditionally Merck KGaA has worked through alliances there, Oschmann said. Erbitux is sold by Bristol-Myers Squibb Co. and Eli Lilly & Co. in the U.S. while the Rebif multiple sclerosis drug is co-marketed by Pfizer Inc.

The company aims to market its own drugs in the U.S. as it has the potential to drive its own business, Oschmann said.

## 'Not Weak'

"We're not weak in terms of our organization there," he said.

Analysts' expectations about sales when he arrived at the family-controlled chemical and pharmaceutical company were "overly pessimistic," Oschmann said. Rebif has maintained steady sales amid newer, competing therapies for MS.

"I saw that there was upside and I think we have delivered on this so far in a very consistent way," he said. "I also saw that the current portfolio would have more resilience than what most people assumed."

Expectations for TH-302, a cancer therapy being tested in late-stage trials for soft tissue sarcoma and pancreatic cancer, and multiple sclerosis treatment ONO-4641 are "low," Goldman Sachs analysts wrote in a note June 20 when they recommended selling the stock. Oschmann said TH-302 is "high risk and high reward" given the diseases don't have adequate treatments. The company will decide by year end whether to pursue a late-stage trial for ONO-4641 and is talking to regulatory authorities about whether there's an approach that "makes sense."

Case 2:16-cv-08166-ESK-MAH Document 24-1 Filed 06/09/18 Page 68 of 87 PageID: 67

## Not Dead

Merck spent more than a decade developing a therapeutic cancer vaccine called tecemotide before data from a late-stage trial showed it failed to help lung cancer patients live longer. Merck is still testing the vaccine in Asia and will make a decision on whether to start another late-stage trial by year-end, pending the outcome of talks with regulatory authorities, Oschmann said.

"We need to define a clear regulatory pathway for this," he said. Merck is considering targeting subgroups of patients who may respond better to the treatment. "The message really is, the program isn't dead."

Either way, Merck intends to continue working on immunotherapies, or treatments that teach the immune system to fight cancer. The company announced last week it's establishing an immuno-oncology unit to develop such treatments. Merck has an immunotherapy candidate in early-stage testing which Oschmann highlighted as promising. Bristol-Myers, Roche Holding AG and Merck & Co. are also developing immunotherapies.

"This is the battle royale in oncology," said Oschmann, who studied veterinary science and owns competitive horses. "It's going to be a very interesting race."

To contact the reporter on this story: Allison Connolly in London at aconnolly4@bloomberg.net

To contact the editor responsible for this story: Phil Serafino at pserafino@bloomberg.net

# EXHIBIT C

Case 2:16-cv-08366-ES-MAH Document 14-1 Filed 01/08/16 Page 72 PageID: 70



Home   Contact   Sitemap   Search        search  >

**Merck KGaA**
Darmstadt, Germany

Our Company   Products & Industries   Innovation   Responsibility   Media   Investors   Careers

Our Company
Business Sectors
Mission Statement, Values, Strategy
Strategy
Management
History
Merck KGaA, Darmstadt, Germany and Merck & Co.
Contact
Publications

Home > Our Company > History

# corporate history



We are the oldest pharmaceutical and chemical company in the world. Our roots date back to the year 1668.

In order to share and document the company's history, we offer access to external visitors and researchers to the following resources at the site premises:

**Archive and historical library**
Sources include about 2,000 meters of hand-written and printed archive material, such as letters, contracts, patents, laboratory journals, manufacturing specifications and advertisements. The oldest documents are about 400 years old. There are over 150,000 photos and films illustrating the last 150 years of corporate history.

The reference library contains more than 8,000 books and an extensive collection of journals. There is an extremely wide variety of topics, ranging from recipe and herb books of the 15th century to expert literature on corporate strategy of the 21st century.

**Museum and event rooms**
The museum, which features a well-stocked exhibition, the history of the company is presented as a precondition for today's success. It makes **day-to-day activities** in a company understandable – starting with the work in the **pharmacy** and **industrial research**, **production and administration** all the way to company sports, the cafeteria or the daycare center.

In addition, rooms are available for lectures small symposia and educational  museum events.

**Timeline**

| | |
|---|---|
| 1668 | Friedrich Jacob Merck acquires the Angel Pharmacy ("Engel-Apotheke") |
| 1741 | Johann Heinrich Merck, Goethe's friend, is born |
| 1827 | Emanuel Merck: from a pharmacy trade to a research-based industrial company |
| 1888 | Comparative chemical analysis with "guaranteed pure reagents" |
| 1900 | The company is represented on all continents |
| 1904 | First list of finished medicinal products; Substances with liquid crystalline properties available |
| 1917 | U.S. subsidiary Merck & Co. expropriated - independent ever since |
| 1920 | For the first time, non-family members join the executive management |
| 1945 | Loss of subsidiaries abroad, in Darmstadt new start from the ruins |
| 1971 | Firm re-establishment in the United States – after Asia and Latin America |
| 1995 | Establishment of Merck KGaA, Darmstadt, Germany, public listing |
| 2003 | Erbitux® : Entry into targeted cancer therapy |
| 2007 | Serono acquisition, divestment of Generics, capital increase, admission to the DAX® |
| 2010 | Millipore acquisition |

More in M – The Explorer Magazine:

**DISCLAIMER**
**Publication of Merck KGaA, Darmstadt, Germany.**

In the United States and Canada the subsidiaries of Merck KGaA, Darmstadt, Germany operate under the umbrella brand EMD. To reflect such fact and to avoid any misconception of the reader of the publication certain logos, terms and business descriptions of the publication have been substituted or additional descriptions have been added. Publications on this homepage, therefore, slightly deviate from the otherwise identical version of the publications provided outside the United States and Canada.

**CONTACT:**
**Corporate History**

Frankfurter Straße 250
64293 Darmstadt
Germany
Tel.: +49 (0)6151 72-2029

Sabine.Bernschneider-Reif@emdgroup.com

**SERVICES**
Recommend Page
Print Page
Request Material

# EXHIBIT D



DISCLAIMER Publication of Merck KGaA, Darmstadt, Germany. In the United States and Canada the subsidiaries of Merck KGaA, Darmstadt, Germany operate under the umbrella brand EMD.

# Interview with Karl-Ludwig Kley, Chairman of the Executive Board, Merck KGaA, Darmstadt, Germany and Rakesh Sachdev, President and CEO, Sigma-Aldrich

**Q:** **Why are you acquiring Sigma-Aldrich?**

**A:** Karl-Ludwig Kley (K-L K): Well, before turning to answer your question let me say this. We are currently in the US, so whenever I refer to Merck, which is my company, I mean Merck KGaA, Darmstadt, Germany. The original Merck.

Well, why are we acquiring Sigma-Aldrich? It's simply a compelling value proposition. They are two great companies joining each other in a sector which is growing. Going forward, in a sector which is full of challenges, full of customer needs, together we will find answers for our customers. Both companies are built on innovation, on science, and we can deliver what the customer wants.

**Q:** **Why does the deal make sense from your perspective? From the Sigma-Aldrich perspective?**

**A:** Rakesh Sachdev (RS): First of all, let me say that this combination is a clear testament to the success of the performance of Sigma-Aldrich, our 9,000 employees and what we have created. And we have created a very customer-intimate, and customer-focused company.

Clearly the combination and this proposal offers a significant benefit to our shareholders because it offers a premium - a significant premium - and it's immediate in cash. It clearly offers a lot of benefits to our customers because the value proposition is significantly enhanced through the combination of the strength of Merck as well as that of Sigma-Aldrich. We will bring more innovation to the customers. We will bring more complementary products and solutions.

And, finally for our employees, this is also very compelling because as a part of a much larger, more global organisation, as we develop more opportunities with our customers, it will translate into more opportunities for our employees on both sides.

**Q:** **Why is now the right time to be making such a sizeable acquisition in life sciences?**

**A:** K-L K: Well, we see a lot of things going on in the sector. We see a lot of technical developments… of technological developments. We see our customers demanding more and more; asking for more global solutions, asking for more service in the sector itself. Now it's time to give more answers to customers' needs.

1

The second aspect comes from the internal side. We have finished our efficiency programme, rolled out the efficiency measures and we are ready to take the next step. And the next step is strengthening our life science business with this deal. It's not just a milestone, it's a quantum leap in our business.

**Q: When you look at the two businesses individually, why do you think they will be better as a combination?**

A: RS: First of all we have a shared perspective on the importance of the whole life sciences industry and clearly as a combination with the strengths that we bring together. We have a complementary geographic presence. We have complementary products. When the customers benefits, the business benefits, and the employees benefit. And that's the real thesis behind this combination.

**Q: So, tell me a little bit more about the benefits to your business from your perspective. How is this really going to propel you to the next level?**

A: K-L K: Firstly geographically. Currently we are under-represented in the US and with the strong presence of Sigma-Aldrich in the US market, we'll have a size which really allows us to take products and service to the customer throughout this great country.

Together we can team up in Asian countries and be very helpful to our customers there. Our business to the academia and lab market is doubling with this acquisition. Regarding our sales to the biopharmaceutical industry, we have very complementary products. And then – and I have to make huge complements to Rakesh and his great company – we can build everything on the best e-commerce platform in this sector. This is something which will really drive this deal and is helpful for everybody involved.

**Q: Do you want to add something about the e-commerce platform that comes with this deal?**

A: RS: We believe Sigma-Aldrich has a leading e-commerce platform today in the life sciences industry. We typically have about 70 million visitors on our website every year and we conduct transactions there. But it's not just for conducting transactions. There is a lot of scientific content that we deliver to our customers who rely on our e-commerce platform, which in turn also gives us a lot of information about our customers that we use to develop new products, drive new innovation. So it's really a two-way street. And I think it's going to be incredibly helpful as we put these two businesses – Merck and Sigma-Aldrich –together, to be able to capitalise on that strength.

**Q: Now you both mentioned your customers, but won't this deal ultimately lead to a period of disruption for them and then loss of choice?**

A: K-L K: I strongly believe customers are becoming more and more demanding. They are asking for global solutions. They are asking for extended

2

services. They are asking for a broad range of possibilities and this is something we can offer. I believe customer service will improve and the opportunities for customers to develop their products further will be better than it is today.

SR: Just to pick up on what Karl said. Two years ago we realigned Sigma-Aldrich really to deliver solutions to our customers and we have moved the company from being a products-focused company to a solutions-focused company. The value proposition that we can provide together now with complementary products, with complementary science is going to take us even further down the solutions path for these customers. So I think our customers will have a lot more choice, but they will also have much better solutions from the combined company.

**Q:** **Just stepping back for a moment, why are you making an acquisition in life sciences and not strengthening your pharma business? Is it an indication that the oldest pharma business in the world is stepping back from pharma and research?**

A: K-L K: No, no. We won't let anyone become older than us! So, we will stay in pharma. We remain committed to pharma. We have just informed the public and the investors and the analysts last week actually about the status of our pharma business. We are delivering very stable sales on our existing portfolio. We had some, we believe, exciting news to share about the pharma pipeline and we will also commit the necessary resources to develop our pipeline products further; be it in partnership or be it alone. So, our pharma business will go on and remain an integral part of our company.

**Q:** **Tell me a little bit about why this deal is an attractive value proposition for your shareholders?**

A: RS: Well, for our shareholders, as I have said, this offers a significant premium from Merck. It's immediate. It's in cash. It's certain. So, I think our shareholders should be pleased with what they are receiving from Merck.

**Q:** **But, from your perspective, you're paying a premium to the all-time high share price of Sigma-Aldrich. So, is that a real good value proposition for your shareholders or are you overpaying?**

A: K-L K: If you want to buy a Rolls Royce you don't get it a bargain price. If you invest to buy the best e-commerce platform in the industry, if you invest to combine these science driven businesses into one greater good you have to pay the price, the value which is represented in this company.

On financial terms, for our shareholders, it's attractive. It's immediately EPS accretive. It meets all our financial criteria. We have a history of fast deleveraging. So, we believe that we can also offer the rating agencies a value proposition which will keep our rating on investment grade. So, for all financial stakeholders it's an attractive value proposition.

3

**Q:    Tell me a little bit more about the synergies and how many jobs might possibly be at stake?**

A:    K-L K:          Well, a deal of that size of course means a lot of synergies, but it would be premature to talk about synergies today.  Once we have the regulatory approvals, once the shareholders have approved the deal then we would have to sit together and find out what this means.

But let me say two things.  One, of course, is a very clear commitment to St. Louis.  The city has been the home of Sigma-Aldrich for decades and we not only respect this, but we treasure the values which are embedded in this operation. And certainly St. Louis will play a major role in taking the combined company forward.

The other message I want to make here very clearly is that – and this is something we have in common – we have a culture which is based on values; on respecting people, on integrity.  When it comes to defining synergies and executing them, we will do it with the highest respect to those people who have made the companies what they are today.

**Q:    When would you expect this transaction to close?  What are the next steps that need to be taken?**

A:    RS:  I think we are expecting the transaction to close by mid-year 2015.  We have to go through the normal regulatory approvals and also getting the shareholder vote from the Sigma-Aldrich shareholders.  So, we will be working through that in the course of the coming weeks and months.

**Q:    And finally, what would be your message to your staff as they go through this integration process?**

A:    RS:  When I sit back and think about Sigma-Aldrich, we have been in business for 80 years and we are a science-based company.  We have had a very constant mission for 80 years and that is to enable science to improve the quality of life. In fact, our people get excited coming to work every morning because they know in some form or fashion they're going to be improving the quality of life. And what's great is that Merck has the same mission, is to improve the quality of life.  I think it's going to be very interesting for the employees of Sigma-Aldrich and Merck to come together because they speak the same language. The culture and the values, as Karl said, are very, very similar and there is going to be some great opportunities for the employees of the combined company as we take this combined business forward to the next level.

[End]

**Cautionary Note Regarding Forward-Looking Statements**

This communication may include "forward-looking statements." Statements that include words such as "anticipate," "expect," "should," "would," "intend," "plan," "project," "seek," "believe," "will," and

4

other words of similar meaning in connection with future events or future operating or financial performance are often used to identify forward-looking statements. All statements in this communication, other than those relating to historical information or current conditions, are forward-looking statements. We intend these forward-looking statements to be covered by the safe harbor provisions for forward-looking statements in the Private Securities Litigation Reform Act of 1995. These forward-looking statements are subject to a number of risks and uncertainties, many of which are beyond our control of Merck KGaA, Darmstadt, Germany, which could cause actual results to differ materially from such statements.

Risks and uncertainties relating to the proposed transaction with Sigma-Aldrich Corporation ("Sigma-Aldrich") include, but are not limited to: the risk Sigma-Aldrich's shareholders do not approve the transaction; uncertainties as to the timing of the transaction; the risk that regulatory or other approvals required for the transaction are not obtained or are obtained subject to conditions that are not anticipated; competitive responses to the transaction; litigation relating to the transaction; uncertainty of the expected financial performance of the combined company following completion of the proposed transaction; the ability of Merck KGaA, Darmstadt, Germany, to achieve the cost-savings and synergies contemplated by the proposed transaction within the expected time frame; the ability of Merck KGaA, Darmstadt, Germany, to promptly and effectively integrate the businesses of Sigma-Aldrich and Merck KGaA, Darmstadt, Germany; the effects of the business combination of Merck KGaA, Darmstadt, Germany, and Sigma-Aldrich, including the combined company's future financial condition, operating results, strategy and plans; the implications of the proposed transaction on certain employee benefit plans of Merck KGaA, Darmstadt, Germany, and Sigma-Aldrich; and disruption from the proposed transaction making it more difficult to maintain relationships with customers, employees or suppliers.

Additional risks and uncertainties include, but are not limited to: the risks of more restrictive regulatory requirements regarding drug pricing, reimbursement and approval; the risk of stricter regulations for the manufacture, testing and marketing of products; the risk of destabilization of political systems and the establishment of trade barriers; the risk of a changing marketing environment for multiple sclerosis products in the European Union; the risk of greater competitive pressure due to biosimilars; the risks of research and development; the risks of discontinuing development projects and regulatory approval of developed medicines; the risk of a temporary ban on products/production facilities or of non-registration of products due to non-compliance with quality standards; the risk of an import ban on products to the United States due to an FDA warning letter; the risks of dependency on suppliers; risks due to product-related crime and espionage; risks in relation to the use of financial instruments; liquidity risks; counterparty risks; market risks; risks of impairment on balance sheet items; risks from pension obligations; risks from product-related and patent law disputes; risks from antitrust law proceedings; risks from drug pricing by the divested Generics Group; risks in human resources; risks from e-crime and cyber attacks; risks due to failure of business-critical information technology applications or to failure of data center capacity; environmental and safety risks; unanticipated contract or regulatory issues; a potential downgrade in the rating of the indebtedness of Merck KGaA, Darmstadt, Germany, or Sigma-Aldrich; downward pressure on the common stock price of Merck KGaA, Darmstadt, Germany, or Sigma-Aldrich and its impact on goodwill impairment evaluations; the impact of future regulatory or legislative actions; and the risks and uncertainties detailed by Sigma-Aldrich with respect to its business as described in its reports and documents filed with the U.S. Securities and Exchange Commission (the "SEC").

The foregoing review of important factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements that are included elsewhere, including the Report on Risks and Opportunities Section of the most recent annual report and quarterly report of Merck KGaA, Darmstadt, Germany, and the Risk Factors section of Sigma-Aldrich's most recent reports on Form 10-K and Form 10-Q. Any forward-looking statements made in this communication are qualified in their entirety by these cautionary statements, and there can be no assurance that the actual results or developments anticipated by us will be realized or, even if substantially realized, that they will have the expected consequences to, or effects on, us or our business or operations. Except to the extent required by applicable law, we undertake no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

**Important Additional Information**

This communication is being made in respect of the proposed merger transaction involving Sigma-Aldrich and Merck KGaA, Darmstadt, Germany. The proposed merger will be submitted to the stockholders of Sigma-Aldrich for their consideration. In connection therewith, Sigma-Aldrich intends to file relevant materials with the SEC, including a preliminary proxy statement and a definitive proxy statement. The definitive proxy statement will be mailed to the stockholders of Sigma-Aldrich. BEFORE MAKING ANY VOTING OR ANY INVESTMENT DECISION, INVESTORS AND SECURITY HOLDERS ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT REGARDING THE PROPOSED TRANSACTION AND ANY OTHER RELEVANT DOCUMENTS FILED OR TO BE FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION. Investors and security holders may obtain free copies of the proxy statement, any amendments or supplements thereto and other documents containing important information about Sigma-Aldrich, once such documents are filed with the SEC, through the website maintained by the SEC at www.sec.gov. Copies of the documents filed with the SEC by Sigma-Aldrich will be available free of charge on Sigma-Aldrich's website at www.sigmaaldrich.com under the heading "SEC Documents" within the "Investor Info" section in the "Investors" portion of Sigma-Aldrich's website. Shareholders of Sigma-Aldrich may also obtain a free copy of the definitive proxy statement by contacting Sigma-Aldrich's Investor Relations Department at (314) 898-4643.

Sigma-Aldrich and certain of its directors, executive officers and other members of management and employees may be deemed to be participants in the solicitation of proxies in connection with the proposed transaction. Information about the directors and executive officers of Sigma-Aldrich is set forth in its proxy statement for its 2014 annual meeting of stockholders, which was filed with the SEC on March 21, 2014, its annual report on Form 10-K for the fiscal year ended December 31, 2013, which was filed with the SEC on February 6, 2014, and in subsequent documents filed with the SEC, each of which can be obtained free of charge from the sources indicated above. Other information regarding the participants in the proxy solicitation of the stockholders of Sigma-Aldrich and a description of their direct and indirect interests, by security holdings or otherwise, will be contained in the preliminary and definitive proxy statements and other relevant materials to be filed with the SEC when they become available.

# EXHIBIT E





# Merck and Pfizer Announce Initiation of Phase III First-Line Trial of Avelumab in Patients with Recurrent or Stage IV Non-Small Cell Lung Cancer

- **Trial marks second Phase III study of avelumab in non-small cell lung cancer (NSCLC) initiated by Merck and Pfizer in just over six months**

- **Primary endpoint is progression-free survival in previously untreated patients with recurrent or Stage IV programmed death-ligand 1 positive (PD-L1+) NSCLC**

November 04, 2015 08:00 AM Eastern Standard Time

DARMSTADT, Germany & NEW YORK–(BUSINESS WIRE)–**Not intended for UK-based media**

Merck and Pfizer today announced the initiation of an international Phase III study of the investigational cancer immunotherapy avelumab* in a treatment naïve advanced NSCLC setting. The study, JAVELIN Lung 100, is designed to assess the safety and efficacy of avelumab compared with platinum-based doublet chemotherapy, in patients with late-stage NSCLC who have not previously received any treatment for their systemic lung cancer. Avelumab (previously known as MSB0010718C) is an investigational fully human anti-PD-L1 IgG1 monoclonal antibody that potentially uses the body's own immune system to fight cancer.

The Phase III study is an open-label, multicenter, randomized clinical trial in which patients with recurrent or Stage IV PD-L1+ NSCLC will receive either avelumab or the investigator's choice of platinum-based chemotherapy, depending on the patient's histology (either squamous or non-squamous), as first-line treatment. Patients will be pre-screened for PD-L1+ status using an immunohistochemistry-based companion diagnostic test.

The study expects to enroll approximately 420 patients across more than 240 sites in Africa, America (North and South), Asia and Europe. Clinical trials in North America on behalf of Merck will be conducted by EMD Serono, the company's US and Canadian biopharma business.

"Through this Phase III trial, we hope to gain a better understanding of avelumab as a potential first-line treatment for non-small cell lung cancer – a prevalent and devastating disease," said Dr. Luciano Rossetti, Head of Global Research & Development at Merck's biopharma business. "We are working to help patients with this challenging cancer and will continue to develop our NSCLC program by evaluating avelumab as a potential monotherapy and in combination with our extensive portfolios of approved and investigational oncology therapies."

endpoints include progression-free survival in patients with strongly PD-L1 positive (PD-L1++) tumors, overall survival, objective response rate, quality of life, tolerability and safety in patients treated with avelumab versus investigator-choice chemotherapy. This is the second randomized Phase III study of avelumab in NSCLC initiated in just over six months; the first study was initiated in April 2015 and is evaluating avelumab in patients whose disease has progressed after receiving a platinum-containing doublet chemotherapy compared with docetaxel.

"There is great promise for the use of immunotherapy in the treatment of non-small cell lung cancer and this new trial underscores our continuing commitment to investigating potential immune-based treatment options for this devastating disease," said Dr. Mace Rothenberg, Senior Vice President of Clinical Development and Medical Affairs and Chief Medical Officer for Pfizer Oncology. "The clinical development program for avelumab continues to accelerate, and the initiation of this Phase III study represents another important achievement in 2015 for the alliance between Merck and Pfizer."

The clinical development program for avelumab now includes more than 1,400 patients who have been treated across more than 15 tumor types, including breast cancer, gastric/gastro-esophageal (GEJ) cancers, head and neck cancer, Merkel cell carcinoma, melanoma, NSCLC, ovarian cancer, renal cell carcinoma and urothelial (e.g., bladder) cancer.

*Avelumab is the proposed International Non-proprietary Name for the anti-PD-L1 monoclonal antibody (MSB0010718C). Avelumab is under clinical investigation and has not been proven to be safe and effective. There is no guarantee any product will be approved in the sought-after indication by any health authority worldwide.

**References**

1. American Cancer Society (2015) Global Facts & Figures Third Edition. Available from: www.cancer.org/acs/groups/content/@research/documents/document/acspc-044738.pdf. Accessed October 2015.

2. American Cancer Society (2015) Lung Cancer (Non-Small Cell) [Fact sheet]. Available from: www.cancer.org/acs/groups/cid/documents/webcontent/003115-pdf. Accessed October 2015.

3. Mayo Clinic (2015) Cancer survival rate: what it means for your prognosis: http://www.mayoclinic.org/diseases-conditions/cancer/in-depth/cancer/art-20044517. Accessed October 2015.

**About Non-Small Cell Lung Cancer**

Globally, lung cancer is the most common cause of cancer-related deaths in men and the second most common in women,[1] responsible for more deaths than colon, breast and prostate cancer combined[2]. NSCLC is the most common type of lung cancer, accounting for 85 to 90 percent of all lung cancers[2]. The five-year survival rate for people diagnosed with late-stage lung cancer that has spread (metastasized) to other areas of the body is 4 percent.[3]

**About Avelumab**

antibody. By inhibiting PD-L1 interactions, avelumab is thought to enable the activation of T-cells and the adaptive immune system. By retaining a native Fc-region, avelumab is thought to engage the innate immune system and induce antibody-dependent cell-mediated cytotoxicity (ADCC). In November 2014, Merck and Pfizer announced a strategic alliance to co-develop and co-commercialize avelumab.

**About Merck-Pfizer Alliance**

Immuno-oncology is a top priority for Merck and Pfizer. The global strategic alliance between Merck and Pfizer enables the companies to benefit from each other's strengths and capabilities and further explore the therapeutic potential of avelumab, an investigational anti-PD-L1 antibody initially discovered and developed by Merck. The immuno-oncology alliance will jointly develop and commercialize avelumab and advance Pfizer's PD-1 antibody. The alliance will collaborate on up to 20 high priority immuno-oncology clinical development programs, including combination trials, many of which are expected to commence in 2015.

**Pfizer Inc.: Working together for a healthier world®**

At Pfizer, we apply science and our global resources to bring therapies to people that extend and significantly improve their lives. We strive to set the standard for quality, safety and value in the discovery, development and manufacture of healthcare products. Our global portfolio includes medicines and vaccines, as well as many of the world's best-known consumer healthcare products. Every day, Pfizer colleagues work across developed and emerging markets to advance wellness, prevention, treatments and cures that challenge the most feared diseases of our time. Consistent with our responsibility as one of the world's premier innovative biopharmaceutical companies, we collaborate with health care providers, governments and local communities to support and expand access to reliable, affordable health care around the world. For more than 150 years, Pfizer has worked to make a difference for all who rely on us. To learn more, please visit us at www.pfizer.com.

**About Merck**

Merck is a leading science and technology company in healthcare, life science and performance materials. Around 40,000 employees work to further develop technologies that improve and enhance life – from biopharmaceutical therapies to treat cancer or multiple sclerosis, cutting-edge systems for scientific research and production, to liquid crystals for smartphones and LCD televisions. In 2014, Merck generated sales of € 11.3 billion in 66 countries.

Founded in 1668, Merck is the world's oldest pharmaceutical and chemical company. The founding family remains the majority owner of the publicly listed corporate group. Merck, Darmstadt, Germany holds the global rights to the Merck name and brand. The only exceptions are the United States and Canada, where the company operates as EMD Serono, EMD Millipore and EMD Performance Materials.

All Merck Press Releases are distributed by e-mail at the same time they become available on the Merck Website. Please go to www.merckgroup.com/subscribe to register online, change your selection or discontinue this service.

**Pfizer Disclosure Notice**

The information contained in this release is as of November 4, 2015. Pfizer assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

This release contains forward-looking information about avelumab (MSB0010718C), including a potential indication for avelumab for the treatment of patients with late-stage NSCLC who have not previously received any treatment for their systemic lung cancer, Pfizer's and Merck's immuno-oncology alliance involving anti-PD-

substantial risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. Risks and uncertainties include, among other things, the uncertainties inherent in research and development, including the ability to meet anticipated clinical study commencement and completion dates as well as the possibility of unfavorable study results; risks associated with interim data, including the risk that the final results of the Phase I study for avelumab and/or additional clinical trials may be different from (including less favorable than) the interim data results and may not support further clinical development; the risk that clinical trial data are subject to differing interpretations, and, even when we view data as sufficient to support the safety and/or effectiveness of a product candidate, regulatory authorities may not share our views and may require additional data or may deny approval altogether; whether and when drug applications may be filed in any jurisdictions for any potential indications for avelumab, combination therapies or other product candidates; whether and when any such applications may be approved by regulatory authorities, which will depend on the assessment by such regulatory authorities of the benefit-risk profile suggested by the totality of the efficacy and safety information submitted; decisions by regulatory authorities regarding labeling and other matters that could affect the availability or commercial potential of avelumab, combination therapies or other product candidates; and competitive developments.

A further description of risks and uncertainties can be found in Pfizer's Annual Report on Form 10-K for the fiscal year ended December 31, 2014, and in its subsequent reports on Form 10-Q, including in the sections thereof captioned "Risk Factors" and "Forward-Looking Information and Factors That May Affect Future Results", as well as in its subsequent reports on Form 8-K, all of which are filed with the SEC and available at www.sec.gov and www.pfizer.com.

## Contacts

**Merck**

Media: Gangolf Schrimpf, +49 6151 72 9591

Investor Relations: +49 6151 72 3321

or

**Pfizer**

Media: Sally Beatty, +1 212 733 6566

Investor Relations: Ryan Crowe, +1 212 733 8160

# EXHIBIT F



**BM** Breaking News & Headlines

HOME    /    BUSINESS    /    TECHNOLOGY    /    MARKETS    /    INTERNET    /    EARNINGS    /    ABOUT    /

# Today's Watch List: Merck & Co. Inc. (NYSE:MRK), Imprivata, Inc. (NYSE:IMPR), Chesapeake Energy Corporation (NYSE:CHK), Raptor Pharmaceuticals Corp. (NASDAQ:RPTP), Daegis Inc. (NASDAQ:DAEG)

On 15 October, Merck & Co. Inc. (NYSE:MRK) announced the relaunch of its brand identity. The fundamental revision of the visual appearance as well as the introduction of a new logo reflects the transformation into a global science and technology company.

Merck & Co. Inc. (NYSE:MRK)'s stock on 16 October traded at beginning with a price of $51.30 and when day-trade ended the stock finally increased 1.50% to end at $51.48. Merck & Co. Inc. (NYSE:MRK)'s showed weekly performance of 1.04%.

Imprivata, Inc. (NYSE:IMPR) said that, it will release its full third quarter 2015 results after the market close on November 2, 2015 and management will provide a complete discussion of the third quarter results as well as an update on our fourth quarter outlook on the Company's quarterly earnings call on November 2, 2015 at 5:00 pm Eastern Time.

Return on Investment for Imprivata, Inc. (NYSE:IMPR) is -24.30% and on Friday its shares closed at $11.20. Imprivata, Inc. (NYSE:IMPR) monthly performance stands at -43.66% while its year to date performance is -13.85%.

On 14 October, Chesapeake Energy Corporation (NYSE:CHK) has named R. Brad Martin as nonexecutive chairman. He replaces former Conoco Inc. executive Archie Dunham, who will remain on the board as chairman emeritus. The changes are effective immediately.

Chesapeake Energy Corporation (NYSE:CHK) shares increased 0.60% on last trading day to close the day at $8.40. Company price to sale ratio is 0.34 and has 1.10% insider ownership. Chesapeake Energy Corporation (NYSE:CHK) belongs to Basic Materials sector.

Zacks upgraded shares of Raptor Pharmaceuticals Corp. (NASDAQ:RPTP) from a sell rating to a hold rating in a report published on Monday, Analyst Ratings.Net reports.

On last trading day Raptor Pharmaceuticals Corp. (NASDAQ:RPTP) decreased -3.92% to close at $5.89. RPTP is -63.82% away from its 52 week high and is moving 13.93% ahead of its 52 week low. Raptor Pharmaceuticals Corp. (NASDAQ:RPTP) return on investment (ROI) is -23.70% while return on equity (ROE) is -105.60%.

Daegis Inc. (NASDAQ:DAEG) has entered into a definitive agreement with Open Text Corporation ("OpenText") and an indirect wholly owned subsidiary of OpenText whereby OpenText will acquire all of the outstanding shares of Daegis for $0.82 per share in cash pursuant to an Agreement and Plan of Merger dated October 8, 2015 (the "Merger Agreement").

Daegis Inc. (NASDAQ:DAEG) on Friday closed at $0.81. Stock institutional ownership is 20.60% while insider ownership includes 49.09%. Daegis Inc. (NASDAQ:DAEG) distance from 50-day simple moving average (SMA50) is 79.77%.

JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| MERCK & CO., INC., and MERCK SHARP & DOHME CORP. | MERCK KGAA |

| | |
|---|---|
| **(b)**   County of Residence of First Listed Plaintiff   Union County<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Darmstadt, Germany<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**   Attorneys *(Firm Name, Address, Email and Telephone Number)*<br>John E. Flaherty, Esq.<br>McCarter & English, LLP, Four Gateway Center, 100 Mulberry Street,<br>Newark, NJ, 07102. Tel: 973-622-4444 Email: jflaherty@mccarter.com | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
         Plaintiff

☒ 3   Federal Question
         *(U.S. Government Not a Party)*

☐ 2   U.S. Government
         Defendant

☐ 4   Diversity
         *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                            *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>     & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>     Student Loans<br>     (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>     of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>     Liability<br>☐ 320 Assault, Libel &<br>     Slander<br>☐ 330 Federal Employers'<br>     Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>     Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>     Product Liability<br>☐ 360 Other Personal<br>     Injury<br>☐ 362 Personal Injury -<br>     Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury  -<br>     Product Liability<br>☐ 367 Health Care/<br>     Pharmaceutical<br>     Personal Injury<br>     Product Liability<br>☐ 368 Asbestos Personal<br>     Injury Product<br>     Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>     Property Damage<br>☐ 385 Property Damage<br>     Product Liability | ☐ 625 Drug Related Seizure<br>     of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>     28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☒ 840 Trademark<br><br>**LABOR** | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>     Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>     Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>     Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>     Act/Review or Appeal of<br>     Agency Decision<br>☐ 950 Constitutionality of<br>     State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>     Accommodations<br>☐ 445 Amer. w/Disabilities -<br>     Employment<br>☐ 446 Amer. w/Disabilities -<br>     Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>     Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>     Conditions of<br>     Confinement | ☐ 710 Fair Labor Standards<br>     Act<br>☐ 720 Labor/Management<br>     Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>     Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>     Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>     Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>     or Defendant)<br>☐ 871 IRS—Third Party<br>     26 USC 7609 | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
         Proceeding

☐ 2   Removed from
         State Court

☐ 3   Remanded from
         Appellate Court

☐ 4   Reinstated or
         Reopened

☐ 5   Transferred from
         Another District
         *(specify)*

☐ 6   Multidistrict
         Litigation

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 1114; 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c); etc., see Complaint.
Brief description of cause: Complaint for Trademark Infringement, Trademark Dilution, Unfair Competition, False Advertising, Deceptive
Trade Practices, Cybersquatting, and Breach of Contract

## VII.  REQUESTED IN
## COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes   ☐ No

## VIII.  RELATED CASE(S)
## IF ANY

*(See instructions):*

JUDGE   -

DOCKET NUMBER   -

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 01/15/2016 | s/John E. Flaherty |

**FOR OFFICE USE ONLY**

RECEIPT #                AMOUNT                      APPLYING IFP                         JUDGE                        MAG. JUDGE